WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| THE UNITED STATES OF AMERICA FOR THE USE AND BENEFIT OF U.S. PREFAB, INC., an Arizona corporation, <br><br>  Plaintiff, <br><br> vs. <br><br> NORQUAY CONSTRUCTION, INC., an Arizona corporation, et al., <br><br>  Defendants. | No. CIV 06-1598 PHX RCB <br><br> O R D E R |

This matter arises out of a construction project governed by the Miller Act, 40 U.S.C. § 3131 et seq., in which Defendant Norquay Construction, Inc. ("Norquay"), the general contractor on the project, entered into a contract with the United States Bureau of Reclamation (the "Bureau") for the construction and repair of its Phoenix area office headquarters. Compl. (doc. # 1). On June 22, 2006, Plaintiff U.S. Prefab, Inc. ("Prefab"), a subcontractor on the project, brought suit against Norquay and its surety, Safeco Insurance Company of America ("Safeco"), seeking payment of a

disputed amount of charges incurred due to "hard dig" conditions it encountered in its performance of the subcontract. Id. Currently before the Court is Defendants' motion for summary judgment (doc. # 17). The motion has been fully briefed. See Resp. (doc. # 25); Reply (doc. # 27). Having carefully considered the arguments raised, the Court now rules.

**I.   BACKGROUND**

   **A. Undisputed Facts**

On July 12, 2005, Norquay and Prefab entered into a $90,278 subcontract in which Prefab agreed to install carports at the Bureau's Phoenix area office headquarters. Defs.' Statement of Facts ("DSOF") (doc. # 18), Ex. 1 at 1. The contract required Prefab to perform its work "in accordance with [inter alia] . . . Specifications . . . and Contract Documents." Id. It is undisputed that a specification entitled "Specification Section: 10534 – Car Shelters" was available for Prefab's inspection and review during its bidding on the project and until its completion. Id., Ex. 4 ¶¶ 6-7; DSOF (doc. # 18) ¶¶ 4-5; Pl.'s Statement of Facts ("PSOF") (doc. # 26) at 2. According to the specification, Prefab was obligated to "[e]xamine subsurfaces to receive Work and [to] report detrimental conditions in writing to Government/Owner." DSOF (doc. # 18), Ex. 2 at 3. The specification further provided that Prefab's "[c]ommencement of Work w[ould] be construed as acceptance of subsurfaces." Id.

Near the end of Prefab's work on the project, a dispute arose between the parties over charges of $18,675.36 in excess of the base contract price due to alleged "hard dig" conditions encountered by Prefab in the course of its drilling work in the

parking areas. DSOF (doc. # 18), Ex. 5 at 3. Prefab submitted the change order to Norquay on October 31, 2005, after the additional costs had already been incurred, but left the total dollar amount on its request blank. Id. Norquay's superintendent signed the change order with the notation, "I acknowledge this work was done," apparently to reflect that the change order was presented for his approval after the work had already been performed. Id., Ex. 6 ¶ 8. It is undisputed that Prefab did not submit a drilling cost breakdown when it presented its change order for the superintendent's approval. Id. ¶ 9; DSOF (doc. # 18) ¶ 8; PSOF (doc. # 26) at 2.

Once presented with the breakdown, Norquay rejected Prefab's demand for drilling costs in excess of the base contract amount, pointing out that Prefab did not request to see a copy of the soil report prior to submitting its bid on the project. DSOF (doc. # 18), Ex. 5 at 1, Ex. 7. Nevertheless, Norquay agreed to submit Prefab's additional "hard dig" costs for the Bureau's approval, albeit without guaranteeing any favorable outcome. Id., Ex. 7.

The Bureau denied Prefab's cost change proposal, and rebuffed Norquay's numerous requests for a meeting to discuss the proposal. By letter dated February 6, 2006, the Bureau stated that the additional costs could not be considered, because the "cost proposal offers no evidence that the site conditions were different than those described in the [soil] report." Id., Ex. 9. Norquay then requested a meeting to discuss the matter with the Bureau. Id., Ex. 10. The Bureau denied Norquay's request on February 15, 2006, taking the position that there was no basis to discuss the matter "[u]ntil evidence [wa]s provided[] which [would]

contradict[] the site conditions presented in the [soil report] included in the contract documents." Id., Ex. 11. Norquay repeated its request for a meeting, but was denied again by the Bureau in an April 10, 2006 letter reiterating the same argument concerning the soil report. Id., Ex. 13 at 1, Ex. 14.

In its final attempt to seek an audience with the Bureau, Norquay took the position that "a hard dig situation should not have been encountered" based on the information contained in the soil report. Id., Ex. 15. To make its case for Prefab, Norquay's letter analyzed six boring logs discussed in the soil report, and broke them out into two groups. Id. The first group represented drill holes in the parking areas-- boring logs 7, 8, and 9-- while the second group represented drill holes at the outer edges of the parking areas-- boring logs 1, 4, and 6. Id. Although drilling depths of thirteen-and-a-half to eighteen feet were recorded for the outer edges of the parking areas, the boring logs for the parking areas indicated that drilling was stopped at three feet. Id. Based on that information, and in view of Prefab's obligation to drill eight feet for the installation of the carport footings, Norquay took the position that the soil report did not provide adequate information on which Prefab could have relied in preparing its bid. Id.

In response to Norquay's criticisms, the Bureau stated that the boring logs for the outer edges of the parking areas were representative of the subsurface conditions that would have been encountered directly in the parking areas had the drilling at those other sites been allowed to proceed beyond three feet. Id., Ex. 16. The Bureau also underscored the fact that all eleven drill

-4-

holes discussed in the soil report "indicated moderately cemented material at all depths, which did not present a problem with the drill/auger during the geological investigations, and thus did not represent or indicate a hard dig condition for the 8 foot depth design requirement" for the carport footings. Id.  Finally, the Bureau pointed out that Prefab had no problem drilling to the required depth of eight feet once the proper "industry standard" equipment was used, and attributed the additional drilling costs to Prefab's initial use of "undersized" and inadequate equipment. Id.

After unsuccessful attempts at an out-of-court resolution of the matter, Prefab filed the present action against Norquay and its surety, Safeco, on June 22, 2006.  Compl. (doc. # 1).

**B. Disputed Facts**

For purposes of the present motion, it is disputed whether the soil report, also referred to in the record as the "Geotechnical Engineering Report," DSOF (doc. # 18), Ex. 3, was identified among the contract documents referred to in Prefab's contract with Norquay.  DSOF (doc. # 18) ¶ 4-5; PSOF (doc. # 26) at 2. Defendants have submitted an affidavit by Norquay's project coordinator stating that the soil report was included in the contract documents and was available for Prefab's review during the bidding process and through the completion of the project.  DSOF (doc. # 18), Ex. 4.  However, they have not cited to any portion of the contract, and the Court's independent review has not revealed any provision that names the soil report in any list of contract

documents.[1]  See id., Ex. 1.  Prefab contends that its contract did not place it on notice of any soil report that it could have reviewed during the bidding process or project duration, PSOF (doc. # 26) at 2.

The parties also dispute whether the change order reflected a valid amendment to the base contract.  See id. ¶¶ 4-7; DSOF (doc. # 18) ¶ 10; Defs.' Supplemental Statement of Facts ("DSSOF") (doc. # 28) at 2.  Although this dispute concerns a legal question, the Court will briefly note the factual bases for the parties' respective positions.  Section 5.1 of the contract, entitled "Proceeding with Changes in the Work" provides as follows:

> The subcontractor shall proceed with any owner or contractor changes to the base contract only after receiving authorization by the contractor in writing before the Work is accomplished in the field. . . . As [sic] request for change to the Contractor must include a cost breakdown of man hours, rate per hours, material quantities and unit prices and the hourly cost of equipment if needed to complete the change in work.

DSOF (doc. # 18), Ex. 1 at 4.  Prefab does not challenge Defendants' assertion that it submitted the change order after it had already completed the work and without contemporaneously providing its drilling cost breakdown, but suggests that Norquay had prior notice of the changed conditions.  Id. ¶¶ 7-8; PSOF (doc. # 26) at 2.  Prefab has not supplied the Court with any evidence in support of this contention.

---

[1] The Court notes that the car shelters specification, which was included in the contract documents available for Prefab's review, explicitly required Prefab to "[e]xamine subsurfaces to receive Work and [to] report detrimental conditions in writing to Government/Owner."  DSOF (doc. # 18), Ex. 2 at 3.

1    Finally, Prefab disputes the accuracy of the Bureau's
2 statement that the soil report would have placed it on sufficient
3 notice of the conditions actually encountered in the course of its
4 drilling work, relying, it seems, on the analysis by Norquay in its
5 May 1, 2006 letter to the Bureau.  Id. at 3; DSOF (doc. # 18), Ex.
6 15.  For their part, Defendants emphasize that the position Norquay
7 previously took as to whether the soil report provided sufficient
8 notice of any "hard dig" conditions was only made for purposes of
9 presenting Prefab's case to the Bureau, and did not reflect a
10 statement of fact.  DSSOF (doc. # 28) at 2.

**II.   STANDARD OF REVIEW**

12    Summary judgment is appropriate "when there is no genuine
13 issue of material fact" such that "the moving party is entitled to
14 judgment as a matter of law."  Fed. R. Civ. P. 56.  In determining
15 whether to grant summary judgment, a district court must view the
16 underlying facts and the inferences to be drawn from those facts in
17 the light most favorable to the nonmoving party.  See Matsushita
18 Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

19    If a party will bear the burden of proof at trial as to an
20 element essential to its claim, and fails to adduce evidence
21 establishing a genuine issue of material fact with respect to the
22 existence of that element, then summary judgment is appropriate.
23 See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Not
24 every factual dispute is capable of defeating a properly supported
25 motion for summary judgment.  Rather, the party opposing the motion
26 must show that there is a genuine issue of material fact.  See
27 Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A
28 factual dispute is genuine if the evidence is such that a rational

-7-

trier of fact could resolve the dispute in favor of the nonmoving party. Id. at 248. A fact is material if determination of the issue might affect the outcome of the case under the governing substantive law. Id. Thus, a party opposing a motion for summary judgment cannot rest upon bare allegations or denials in the pleadings, but must set forth specific facts demonstrating a genuine issue for trial. See id. at 250. If the nonmoving party's evidence is merely colorable or not significantly probative, a court may grant summary judgment. See id. at 249; see also Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, 818 F.2d 1466, 1468 (9th Cir. 1987).

**III. DISCUSSION**

Under the Miller Act, a general contractor on a federal construction project must furnish a payment bond "for the protection of all persons supplying labor and material in the prosecution of work provided for in [the] contract." 40 U.S.C. § 270a(a)(2). The Act creates a cause of action in favor of "every person who has furnished labor or material in the prosecution of the work provided for in [the] contract. " 40 U.S.C. § 270b(a). Under the Act, such persons "who have not been paid in full therefor before the expiration of a period of ninety days after the day on which the last of the labor was done or performed by him or material was furnished or supplied by him for which such claim is made shall have the right to sue on [the] payment bond . . . for the sum or sums justly due him." Id.

Norquay and its surety, Safeco, contend that they are entitled to summary judgment, because there is no genuine issue of material fact from which a trier of fact could find that Prefab was "justly

due" any part of the disputed charges for "hard dig" drilling.  In particular, Defendants argue that (1) Prefab did not examine the soil report, conduct its own study to refute the soil report, or provide any report of detrimental conditions, and, by commencing work, accepted the subsurface conditions as they were, (2) Prefab failed to obtain authorization to proceed with its proposed changes to the base contract in the manner required by the contract, and (3) the contract does not entitle Prefab to payment from Norquay for amounts claimed by Prefab, but not received from the Bureau. The Court considers each argument in turn.

**A. Acceptance of Subsurface Conditions**

At the outset, the Court notes that Prefab has not come forward with any evidence of subsurface studies conducted prior to its bid on the project.  Although the Court has not located any specific reference in the contract documents to the soil report that Norquay claims to have made available for Prefab's review during the bidding phase, the car shelters specification that Prefab acknowledges to have had at its disposal clearly admonishes prospective bidders to examine the subsurfaces, and warns that their commencement of work would be construed as acceptance of those subsurfaces.  Given this guidance, in lieu of incurring the additional expense of preparing its own study, Prefab could easily have inquired as to the existence of any soil report on which it could rely in preparing its bid for the project.  It seems that it did not do so.  In any event, the fact that Prefab now appears to dispute whether the Bureau's soil report, if it had been consulted, would have provided sufficient notice of the subsurface conditions actually encountered is immaterial, as its commencement of work

constituted its acceptance of the subsurface conditions as they were.

Had proper due diligence been performed in the bidding phase, Prefab may have become aware of any alleged shortcoming of the Bureau's soil report. See DSOF (doc. # 18), Ex. 15 (explaining that drill holes in parking areas only tested to three-feet, while design specifications required a drilling depth of eight feet). This may have allowed Prefab to conduct its own tests to examine subsurface conditions beyond the three-foot depth covered in the Bureau's soil report, with the possibility of charging those tests to the Bureau in its bid, but with the obvious risk of losing the contract. Under the circumstances, it appears that Prefab took the calculated risk to bid and commence work without first examining the subsurface conditions. The fact that this course may have proven unwise in hindsight does not, on its own, provide an avenue to alter the outcome for which the parties have contracted.

The Ninth Circuit has stated that "bidders are required to inspect documents brought to their attention in the bidding materials <u>and to make a general inspection of the project site</u>." <u>Umpqua River Navigation Co. v. Crescent City Harbor Dist.</u>, 618 F.2d 588, 594 (9th Cir. 1980) (emphasis added). In this case, there is no indication that Prefab attempted to examine the subsurface conditions to discover the alleged "hard dig" conditions until after it was awarded the contract and began its work. By the terms of its contract and the car shelters specification, Prefab cannot bend the terms of its base contract to account for the alleged changed conditions in the subsurfaces, and summary judgment will be granted accordingly.

- 10 -

**B. Failure to Give Notice in Manner Required by Contract**

Defendants maintain that summary judgment is also warranted, because Prefab failed to obtain authorization to proceed with its desired changes to the base contract in the manner demanded by the contract. The Court agrees. Section 5.1 of the contract required Prefab to obtain permission for its proposed changes before completing the relevant work, and required the submission of a cost breakdown with any such request. Prefab acknowledges that it submitted its changed order to Norquay's superintendent <u>after</u> it had completed the subject work,[2] and did so <u>without</u> contemporaneously providing a breakdown of the costs already incurred,[3] <u>i.e.</u>, proceeding instead in a manner explicitly prohibited by the contract.

To circumvent this inconvenient reality, Prefab posits that the change order amended and superseded those contract terms,

---

[2] Prefab suggests that Norquay may have had notice of the changed conditions by other means prior to its submission of the change order, but has not adduced any evidence in support of this implicit argument. <u>See</u> PSOF (doc. # 26) at 2. This argument is of no avail, as it is well settled that "mere denials, unaccompanied by any facts which would be admissible in evidence at a hearing, are not sufficient to raise a genuine issue of fact" for purposes of Rule 56. <u>See</u> Fed. R. Civ. P. 56(e); <u>Piantadosi v. Loew's, Inc.</u>, 137 F.2d 534, 536 (9th Cir. 1943).

[3] Based on the timing, it is noteworthy that those costs should have been known to Prefab at the time the change order was presented to Norquay's approval. Not only did Prefab fail to provide a cost-breakdown with its request, as required by the contract, but it also failed to complete the last and probably most important line of its own form to indicate the total dollar amount of the change requested. <u>See</u> DSOF (doc. # 18), Ex. 5. Given the infrequency with which sophisticated parties such as contractors deal in blank checks, a reasonable interpretation of Prefab's zero-dollar change order would be that it was simply intended to authorize the use of a larger drill auger than that originally contemplated in its bid-- at no extra cost to Norquay or the Bureau.

- 11 -

thereby relieving it of its notice obligations. Resp. (doc. # 25) at 5-6. It refers to the change order as a "negotiated resolution" of its "threat of leaving the job," based on its idiosyncratic view that its agreement to remain and perform that which it had previously agreed to do constituted some quid pro quo. Id. There are countless flaws with this argument, most notably, as Defendants rightly point out, that a party's agreement to do that which it is already bound to do is not valid consideration for purposes of contract modification. See Reply (doc. # 27) at 3-4 (citing Perry v. Farmer, 47 Ariz. 185, 54 P.2d 999 (1936)). Moreover, Prefab's asserted satisfaction with its "negotiated resolution" of its "threat of leaving the job" is misplaced under circumstances potentially indicative of economic duress.[4] See Totem Marine Tug & Barge, Inc. v. Alyeska Pipeline Serv. Co., 584 P.2d 15, 22 (Alaska 1978) (stating that "[i]n many cases, a threat to breach a contract . . . has constituted a wrongful act" for purposes of establishing economic duress) (cited by Frank Culver Elec. v. Jorgenson, 136 Ariz. 76, 78, 664 P.2d 226, 228 (Ct. App. 1983)). Furthermore, Prefab has not shown, nor can the Court discern, which provision of the change order, if it were construed as a valid modification, would override Section 5.1 of the original contract regarding the procedure for approval of changes. See DSOF (doc. # 18), Ex. 5. Consistent with the foregoing, the Court rejects Prefab's claim that its change order reflected a valid amendment to the base

---

[4] As if to illustrate the "negotiated" nature of its change order, the last line of Prefab's "Infield Modification Authorization" reads, "IF THIS ORDER IS NOT SIGNED, U.S. PREFAB INC. CAN NOT [sic] PROCEED FURTHER ON THE PROJECT!" See DSOF (doc. # 18), Ex. 5 (capitalization and exclamation mark in original).

contract.

Contemplating this result, Prefab also argues that Norquay waived the notice provisions of Section 5.1 by (1) signing the change order and (2) presenting Prefab's case to the Bureau with the addition of its own charges for overhead, profit, and state and city taxes. See Resp. (doc. # 25) at 6-7. Prefab cites no legal authority in support of its legal conclusion. Under Arizona law, waiver generally requires the intentional relinquishment of a known right and, according to some authorities, "must be supported by consideration or at least by the equivalent of estoppel." Mohave County v. Mohave-Kingman Estates, 120 Ariz. 417, 422, 586 P.2d 978, 982 (1978) (citations omitted). The Court does not perceive any genuine issue of material fact, based on the instances noted by Prefab, that would suggest any intention on Norquay's part to effect a waiver. The dollar amount on the signed change order was conspicuously left blank by Prefab, and, prior to offering its assistance in seeking payment from the Bureau, Norquay clearly advised Prefab of its reservations regarding the additional charges. See DSOF (doc. # 18), Exs. 5 and 7. Furthermore, as discussed above, there was no consideration for the change order. Finally, in light of the fact that Prefab had already completed its work prior to presenting the change order, there is no evidence of estoppel that might support waiver.

Because Prefab has failed to produce any evidence demonstrating a genuine issue of material fact in support of any theory that would excuse its noncompliance with the requirements of Section 5.1 of its contract, Defendants' motion for summary judgment (doc. # 17) will be granted.

**C. "Pay When Paid" Clause**

Lastly, Defendants argue that they are entitled to summary judgment based on the "pay when paid" clause in Prefab's contract. Section 5.2 of the contract provides as follows:

> The Subcontractor agrees to make all claims for which the owner is or may be liable in the manner provided in the Contract Documents for like claims by the Contractor upon the Owner.
>
> Notice of such claims shall be given by the Subcontractor to the Contractor within one (1) week prior to the beginning of the Subcontractor's Work or the event for which such claim is to be made, or immediately upon the Subcontractor's first knowledge of the event, whichever shall first occur otherwise, such claims shall be deemed waived.
>
> . . .
>
> The Subcontractor shall have no greater right or claim against the Contractor than the Contractor has against the Owner and, <u>Contractor shall not be liable to Subcontractor in excess of any sum actually received from Owner on behalf of Subcontractor.</u>

DSOF (doc. # 18), Ex. 1 at 4 (emphasis added). Prefab contends that Defendants cannot rely on the "pay when paid" clause to the extent that the provision contravenes the purposes of the Miller Act and impairs their rights under the Act. Resp. (doc. # 25) at 3-5 (citing <u>United States ex rel. Walton Tech., Inc. v. Weststar Eng'g, Inc.</u>, 290 F.3d 1199 (9th Cir. 2002)).

The Ninth Circuit has held that subcontract terms affecting "the timing of recovery or the right of recovery under the Miller Act" cannot be enforced to preclude Miller Act liability. <u>United States ex rel. Walton Tech., Inc.</u>, 290 F.3d at 1207. To that end, the court has unequivocally stated that "[a] subcontractor's right of recovery on a Miller Act payment bond accrues ninety days after

- 14 -

the subcontractor has completed its work, not 'when and if' the prime contractor is paid by the government." Id. at 1208. However, the court has been careful to distinguish this issue concerning the timing of payment from those questions involving the measure of payment "justly due" under the Act, stating that

> Considerable differences exist between a case in which the measure of recovery in a Miller Act case is determined by reference to subcontract terms governing how work performed under the subcontract will be compensated and one in which the timing of recovery, and, in some cases, the right of recovery under the Miller Act is dictated by such terms.

Id. at 1207. In the former cases, "[t]he Ninth Circuit . . . looks to the underlying contract in determining the measure of 'sums justly due' under the Miller Act." Id.

The quoted portion of Section 5.2 of the parties' contract appears to be an attempt to obtain a waiver of Prefab's Miller Act rights, at least as to the timing of recovery and may be unenforceable for timing issues. However, based on the preceding discussion in Parts III.A and B, supra, it is apparent to the Court that the Miller Act issues of this case revolve around the measure, not the timing, of payments due. For the same reasons discussed above, the Court finds that Prefab has not demonstrated any triable issue concerning the amounts to which it claims it was equitably, contractually, or statutorily entitled for its "hard dig" drilling.

**IV. CONCLUSION**

Prefab was obligated to examine the subsurfaces to receive work under the subcontract, and its commencement of work constituted its acceptance of the existing subsurface conditions. As such, its base contract must be understood as having been priced

- 15 -

on those conditions which it later encountered on the job. Moreover, its failure to follow the contractually agreed procedure for obtaining authorization for its proposed changes to the base contract further defeats its claims to the disputed funds.  Because Prefab has not demonstrated the existence of any triable issue with regard to these matters,

**IT IS THEREFORE ORDERED** that Defendants' motion for summary judgment (doc. # 17) is GRANTED.

IT IS FURTHER ORDERED directing the Clerk of the Court to enter judgment in favor of Defendants and terminate this case.

DATED this 26th day of June, 2007.

_____
Robert C. Broomfield
Senior United States District Judge

Copies to counsel of record